J-S71029-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
CARLOS LOPEZ-VANEGAS :
:
Appellant : No. 3256 EDA 2018

Appeal from the Judgment of Sentence Entered September 28, 2018
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0000735-2018

BEFORE: BOWES, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY MURRAY, J.: **FILED FEBRUARY 13, 2020**

Carlos Lopez-Vanegas (Appellant) appeals from the judgment of

sentence imposed after a jury convicted him of three counts of rape of a child,

three counts of involuntary deviate sexual intercourse with a child, one count

of aggravated indecent assault of a child, two counts of indecent assault –

complainant less than 13 years of age, one count of corruption of minors, and

one count of endangering the welfare of children.[1]  We affirm.

Appellant's convictions arise from the sexual assault of K.D., age 11,

and C.L., age 5.  The trial court detailed the facts and procedural history of

this case as follows:

> The trial established the following facts.  On November 20,
> 2017, K.D. and C.L. disclosed the sexual abuse to their mutual
> grandmother [(Grandmother)].  [N.T., 7/10/18, at 79-80].

---

[1] 18 Pa.C.S.A. §§ 3121(c), 3123(b), 3125(b), 3126(a)(7), 6301(a)(1)(ii),
4304(a)(1).

[Grandmother] testified that she has two children, [B.R.] and [I.R.]. *Id.* at 75-76. [B.R.] is the mother to three children; in particular she is K.D.'s mother. *Id.* at 76. [I.R.] also has three children, including C.L. *Id.* at 78. Appellant is the father to [I.R.]'s children and was living with her and their children at the time of the abuse.

On November 20, 2017, [Grandmother] was babysitting her grandchildren and her grandson touched one of her granddaughters "in the private parts." *Id.* at 80. [Grandmother] reprimanded her grandson. Spontaneously C.L. said, "[w]ell, my dad touch me in my private parts all the time." *Id.* C.L. indicated to her grandmother that her private parts include her genital area and her buttocks. *Id.* at 80-81.

K.D. also came forward to tell her grandmother that Appellant touched her "in her private parts too, a couple of times." *Id.* at 81. K.D. also disclosed that it would happen during sleepovers when [I.R.] would go to work. Appellant would take her into the bedroom where he and [I.R.] would sleep. He touched her and made her take her clothes off. *Id.* at 82. K.D. was nervous and was willing to talk more, but didn't since the other kids were around. *Id.* at 84. [Grandmother] relayed to [B.R.] what K.D. had told her. *Id.* at 85.

On December 29, 2017, [Grandmother] spoke to K.D. again about her previous disclosure of sexual abuse. *Id.* at 85. [Grandmother] and K.D. were alone and she asked her granddaughter some questions about their previous conversation. *Id.* at 85-86. [Grandmother] told the jury that K.D. became nervous but told her that, "[a]ctually, it did happen other things." [*sic*] *Id.* at 86. [Grandmother] asked her for more details and testified as to K.D.'s response as follows:

he took her to the bedroom and put them in bed; that he took his clothes off and starting touching her. That he did put his. [*sic*] Like she said, his private part in her. And I ask her if it was just touching her or if he put his penis inside, and she said yes, he did. Because she said, "Actually, it did hurt and I tried to scream and he covered my mouth and he didn't allow me to scream, so I started crying." And he said it was fine, it's okay, nothing is going to happen.

- 2 -

*Id.* K.D. also told her grandmother that it happened more than once at [I.R.]'s house. *Id.* at 88.

[Grandmother] relayed this information to [B.R.]. *Id.* at 89. [Grandmother] and [B.R.] took K.D. to the hospital so she could be evaluated. *Id.* On December 30, 2017, the Lansdale Borough Police Department was notified of these allegations, and Detective Oropeza responded to the hospital. [N.T., 7/11/18 at 131-32]. The following day, on December 31, 2017, [I.R.] was notified of the allegations involving C.L. *Id.* at 132-133. A short time after, [I.R.] and her family moved into the home [Grandmother] shared with [B.R.] and her children. [N.T., 7/10/18, at 92].

K.D. testified at trial. She was eleven at the time of trial. [N.T., 7/9/18, at 68.] . . . K.D. told the jury that when she would sleep over [at] [I.R.]'s house with her cousins, Appellant would wake her, while [I.R.] was at work and he would take her to the bedroom where he and [I.R.] slept. *Id.* at 81-82. There, Appellant made K.D.[] take her clothes off. *Id.* at 83. He touched her vaginal area, and she testified that he would put his fingers, tongue and penis inside and move them around. *Id.* at 87-88, 91-93. Appellant also touched her buttocks area and his fingers and penis would go inside and outside that area moving around. *Id.* at 88-89. Appellant used something "squishy" on his penis to make it hurt less. *Id.* at 96, 97. To keep K.D. from screaming, Appellant would put a blanket or a pillow in her mouth. *Id.* at 95. Appellant also forced K.D. to put his penis in her mouth and t[old] her to "suck it." *Id.* at 98-99. Appellant did all these things more than five times. *Id*. at 102-03. K.D. told the jury how she went to the hospital after disclosing this sexual abuse. *Id.* at 106.

On December 30, 2017, K.D. was examined by Amanda Schwenk, R.N., who is a registered nurse at Grandview Hospital. [N.T., 7/10/18, at 98-99]. At trial, Ms. Schwenk read from the triage notes which documented that K.D. requested for both her mother and grandmother not to be in the room to discuss the assault. *Id.* at 101. The only people present during the interview were Nurse Schwenk and Dr. Patro. *Id.* at 102.

C.L., who was five at the time of the trial told the jury that Appellant did a bad thing to her body. [*Id.* at 12-13]. C.L., using a cartoon picture of the front and back of a girl, testified that Appellant did something bad to her vaginal and buttocks area. *Id.* at 13-14. It happened more than once. *Id*. at 14. C.L. was

hesitant to provide details at trial, saying that she doesn't want to say. *Id.* at 17. C.L. acknowledged that she spoke to Miss Maggie at Mission Kids about what happened and said that everything she told her was the truth. *Id.* at 17-18.

Next, A.L., C.L.'s seven-year-old sister, testified. . . . [A.L.] admitted that she told Miss Maggie from Mission Kids that she had seen her father with C.L. in her mom's room in the same bed. *Id.* at 55. At trial[,] she told the jury [that Appellant] had his clothes on, but reported to Mission Kids that Appellant did not have his clothes on when she saw him with her sister. *Id.* at 56. [A.L.] testified that Appellant told her it was a secret when she saw them in the bed together and then took her to a playground. *Id.*

Maggie Sweeney, the Program Manager and forensic interviewer at Mission Kids Advocacy Center, also testified at trial on behalf of the Commonwealth. *Id.* at 109. She was recognized at trial as an expert in forensic interviewing. *Id.* at 110. She explained to the jury that as a forensic interviewer she utilizes open-ended, non-leading developmentally appropriate questions of the children because they elicit the most accurate information from children. *Id.* at 111-12. On January 9, 2018, she conducted a forensic interview of K.D., C.L. and A.L. *Id.* at 113, 115, 117. A second interview of A.L. was conducted on June 27, 2018, based on new information. *Id.* at 117.

[I.R.] was told on December 31, 2017 about the allegations made against Appellant [] by C.L. [N.T., 7/11/18, at 93]. [I.R.] asked C.L. directly about it in front of Appellant, who interjected and said he did nothing. *Id.*[] [I.R.] and her three children moved in with [Grandmother], [B.R.] and [B.R.]'s three children. *Id.* at 95. C.L. revealed to her mother about the sexual abuse. *Id.* at 95-96. A.L. also told her mother that she had a secret with Appellant, involving touching C.L. *Id.* at 96-97. After [I.R.] found all of this out she and her three children moved in with [B.R.]. *Id.* at 97. Additionally, the Commonwealth questioned this witness as to whether she coached or influenced A.L. to change her statement in the second Mission Kids interview. *Id.* at 102-03.

\*       \*       \*

At the conclusion of the four-day trial, Appellant was found guilty of the aforementioned crimes. On September 28, 2018, a sentencing hearing was conducted at which both Appellant's

father, brother, [and] sister-in-law testified on his behalf. Two letters of support for Appellant were submitted and read to [the trial court]. [The trial court] sentenced Appellant to an aggregate sentence of 48 to 69 years [of] imprisonment.

A timely notice of appeal was filed. Appellant was directed to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which he did.

Trial Court Opinion, 2/4/19, at 1-6 (some citations modified).

On appeal, Appellant presents the following issues for review:

I. Whether the trial court abused its discretion in denying Appellant's request for a pre-trial evidentiary hearing to explore allegations of taint regarding the complaints of sexual abuse made by the witnesses of tender years?

II. Whether the trial court abused its discretion in precluding the admission of evidence of contemporaneous allegations of sexual abuse made by the minor victim K.D. against Appellant's two brothers, and evidence of contemporaneous reports to OCY that L.R., who was a relative and companion of both minor victims, was also sexually abused by Appellant and Appellant's two brothers?

Appellant's Brief at 4.[2]

In his first issue, Appellant argues that the trial court abused its discretion in denying his request for a taint hearing for the child witnesses in this case. Appellant asserts that he provided the trial court with evidence of

---

[2] We note that Appellant raised eight issues in his Pa.R.A.P. 1925(b) statement. We address only those issues that Appellant argues in his appellate brief, because the issues Appellant has not argued on appeal are waived. **See** Pa.R.A.P. 2119(a); **see also Commonwealth v. Johnson**, 985 A.2d 915, 924 (Pa. 2009) ("where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived").

taint relating to the child witnesses' testimony and consequently, a hearing was necessary to determine whether they were competent to testify at trial.

"The determination of a witness's competency rests within the sound discretion of the trial court." *Commonwealth v. Davis*, 939 A.2d 905, 906-07 (Pa. Super. 2007). As this Court has recently reiterated, "[t]he general rule in Pennsylvania is that every person is presumed competent to be a witness." *Commonwealth v. Adams-Smith*, 209 A.3d 1011, 1021 (Pa. Super. 2019) (quoting *Commonwealth v. Delbridge*, 855 A.2d 27, 39 (Pa. 2003)). In *Delbridge*, our Supreme Court explained the following regarding competency hearings:

> A competency hearing concerns itself with the minimal capacity of the witness to communicate, to observe an event and accurately recall that observation, and to understand the necessity to speak the truth. A competency hearing is not concerned with credibility. Credibility involves an assessment of whether . . . what the witness says is true; this is a question for the fact finder. An allegation that the [child witness'] memory of the event has been tainted raises a red flag regarding competency, not credibility. Where it can be demonstrated that a [witness'] memory has been affected so that their recall of events may not be dependable, Pennsylvania law charges the trial court with the responsibility to investigate the legitimacy of such an allegation.

*Delbridge*, 855 A.2d at 40.

In child sexual assault cases, taint is an issue that can necessitate a competency hearing. *Id.* at 39 ("[T]aint is a legitimate question for examination in cases involving complaints of sexual abuse made by young children."). In *Delbridge*, our Supreme Court defined taint as "the implantation of false memories or the distortion of real memories caused by

- 6 -

interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child, rendering that child incompetent to testify." *Id.* at 35.

Allegations of taint necessitate a competency hearing in the following circumstances:

> In order to trigger an investigation of competency on the issue of taint, the moving party must show some evidence of taint. Once some evidence of taint is presented, the competency hearing must be expanded to explore this specific question. During the hearing the party alleging taint bears the burden of production of evidence of taint and the burden of persuasion to show taint by clear and convincing evidence. Pennsylvania has always maintained that since competency is the presumption, the moving party must carry the burden of overcoming that presumption.

*Adams-Smith*, 209 A.3d at 1021 (quoting *Delbridge*, 855 A.2d at 40).

> Additionally,

> In analyzing whether a party has met the "some evidence of taint" standard, the trial court considers the totality of the circumstances around the child's allegations. [*Delbridge*, 855 A.2d] at 41. This Court has identified some of the common considerations relevant to this analysis as follows:

> > (1) the age of the child; (2) the existence of a motive hostile to the defendant on the part of the child's primary custodian; (3) the possibility that the child's primary custodian is unusually likely to read abuse into normal interaction; (4) whether the child was subjected to repeated interviews by various adults in positions of authority; (5) whether an interested adult was present during the course of any interviews; and (6) the existence of independent evidence regarding the interview techniques employed.

> *Commonwealth v. Judd*, 897 A.2d 1224, 1229 (Pa. Super. 2006) (citation omitted).

*Commonwealth v. Smith*, 167 A.3d 782, 790 (Pa. Super. 2017).

Here, the trial court explained its decision to deny Appellant's request for a taint hearing as follows:

> In this case, applying the ***Delbridge*** factors, this [c]ourt denied the defense request for a taint hearing because the defense offer of proof was insufficient and did not meet the threshold that would entitle him to a taint hearing. [N.T., 6/25/18, at 17]. There was no evidence of hostile intent or any reason to plant these suggestions or to distort the memory of the children, 11 and five years old. ***Id.***
>
> This Court determined that there was not any questioning that was suggestive. ***Id.*** The Mission Kids interviewer used open-ended, non-suggestive questions. The purpose of the Mission Kids interview is to see that the child is only interviewed once by law enforcement people. ***Id.*** The techniques that were used during the Mission Kids interview were open-ended. ***Id.*** at 18.
>
> Importantly, the initial disclosures of sexual abuse by the children were spontaneous. The statements made were largely consistent. There is no evidence of implanting or distorting memories. ***Id.***
>
> Nothing presented indicated that the primary custodian would have been likely to read abuse in the normal situations. ***Id.*** In fact, the initial statements were not made to the victims' respective mothers.
>
> There were not repeated interviews by various adults in positions of authority. The nurse, to the extent that was an interview, was minimal. It was also [the interaction] where K.D. asked to be alone with the nurse. So there was no interested adult in the room at the time, or in the Mission Kids interviews.
>
> It is important to note that in defense counsel's taint argument he skipped over the spontaneous initial disclosures made on November 20, 2017. Rather, his argument focused on the December 29th follow-up conversation in which [Grandmother] asked K.D. for additional details. Both the fact that [Grandmother] did not go to police after this initial disclosure goes to her lack of hostile intent, and the fact that even after the December 29th conversation [Grandmother] and [B.R.] took K.D. to the hospital and not the police also go to lack of hostile intent.

Finally, it is important that [I.R.] was not told about any of the abuse allegations until December 31, 2017, which was after the police were involved and the abuse reports by the children were made to OCY. Clearly she could not have tainted the sexual abuse allegations and statements made prior to her knowledge.

Trial Court Opinion, 2/4/19, at 10-11.

Based upon our review of the record, including the transcripts of Appellant's pre-trial motions hearing and trial, and the parties' appellate briefs, we agree with the trial court's assessment that a taint hearing was not warranted. The record reveals no evidence indicating the presence of the factors set forth in *Smith* and *Judd*, other than the young age of the children. As the trial court recognized, the actions of Grandmother, in reporting the allegations of sexual abuse, and the Mission Kids interviewer, reflect the absence of those factors, and thus a lack of taint in the child witnesses' testimony. *See id.*; *see also* N.T., 6/25/18, at 17-18.

Furthermore, in his appellate brief, Appellant provides a list of several facts that he contends demonstrates that he provided the trial court with "some evidence of taint." *See* Appellant's Brief at 22-27. Specifically, Appellant points to evidence indicating that: K.D., A.L., and C.L. were young (ages 11, 7, and 5, respectively) when they testified at trial; [I.R.] and Appellant had relationship issues (which included accusations of infidelity by [I.R.] against Appellant); L.R., one of K.D.'s younger siblings, raised allegations of abuse against Appellant and his brothers that the Office of Children and Youth determined were unfounded, and C.L. did not mention that

Appellant's brothers sexually assaulted her in her Mission Kids interview. *See id.* These facts do not provide "some evidence of taint." *See Adams-Smith*, 209 A.3d at 1021. As mentioned above, taint is "the **implantation** of false memories or the **distortion** of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child, rendering that child incompetent to testify." *Delbridge*, 855 A.2d at 35 (emphasis added).

In sum, Appellant cites as evidence of taint certain facts that, at best, could undermine the child witnesses' credibility. He does not, however, point to any evidence that shows any person involved in the case attempted to implant false memories or distort the real memories of the child witnesses. Although the facts may ultimately impact witness credibility, they do not bear upon the objective of a taint hearing – to investigate facts that may show a witness' lack of competency to testify. *See Delbridge*, 855 A.2d at 40. Therefore, as there is no record evidence of taint, the trial court did not abuse its discretion in denying Appellant's request for a taint hearing.

In his second issue, Appellant argues that the trial court abused its discretion in precluding him from introducing evidence that K.D. raised allegations of sexual assault against Appellant's two brothers, and that L.R. also raised allegations of sexual assault against Appellant and his brothers.

The trial court denied admission of this evidence on the basis that it was irrelevant. N.T., 6/25/18, at 32-33.

"Questions concerning the admissibility of evidence are within the sound discretion of the trial court and its discretion will not be reversed absent a clear abuse of discretion." *Commonwealth v. Leaner*, 202 A.3d 749, 773 (Pa. Super. 2019) (quotation and citation omitted). Generally, "all relevant evidence, *i.e.*, evidence which tends to make the existence or non-existence of a material fact more or less probable, is admissible, subject to the prejudice/probative value weighing which attends all decisions upon admissibility." *Commonwealth v. Dillon*, 925 A.2d 131, 136 (Pa. 2007); *see also* Pa.R.E. 401. "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 (comment).

In denying Appellant's evidentiary request, the trial court explained that it "found the third party abuse allegations not admissible because they were irrelevant and completely collateral. . . . There was a clear danger of confusion to the jury and distraction to the jury if these allegations were introduced." Trial Court Opinion, 2/4/19, at 15. We agree.

This Court has explained in sexual assault cases, the Rape Shield Law, 18 Pa.C.S.A. § 3104,[3] "does not always preclude evidence the complainant was a victim of a prior sexual assault, *see Commonwealth v. Johnson*, [] 638 A.2d 940, 942 ([Pa.] 1994), but the proffered evidence must still be **relevant and material** under the rules of evidence." *Commonwealth v. L.N.*, 787 A.2d 1064, 1069 (Pa. Super. 2001) (emphasis added). As the trial court recognized, the allegations of sexual assault against Appellant and his brothers that were not at issue in this case, "did not tend to prove or disprove" whether Appellant abused K.D. and C.L. *See L.N.*, 787 A.2d at 1069. Instead, Appellant's desire to introduce this evidence would have served only to impeach the victims' credibility. Witnesses, however, "may not be contradicted upon a collateral matter[,] *i.e.*, "one which has no relationship to the matter on trial." *Johnson*, 638 A.2d at 942-43.

---

[3] The statute reads, in pertinent part, as follows:

> **(a) General rule.--**Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S.A. § 3104(a).

Finally, given the collateral nature of the accusations, if the trial court had admitted this testimony at trial, the danger of unfair prejudice would have outweighed the testimony's probative value as impeachment evidence. *See* Pa.R.E. 403. In sum, the trial court did not abuse its discretion in precluding the admission of Appellant's proffered evidence. *See* Pa.R.E. 401, 403.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/20